## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| ERIC FULTON, CRYSTAL BUSH, MICHAEL TERRELL and TONYA ROGERS, individually and as representatives of a class of similarly situated persons, on behalf of the FCA US LLC UAW SAVINGS PLAN and the FCA US LLC SALARIED EMPLOYEES' SAVINGS PLAN,<br><br>    Plaintiffs,<br><br>  v.<br><br>FCA US LLC,<br><br>    Defendant. | Case No.: 2:24-cv-13159 |

---

## AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

---

# I.     __INTRODUCTION__[1]

1.      Plaintiffs, Eric Fulton, Crystal Bush, Michael Terrell and Tonya Rogers (collectively, "Plaintiffs"), individually and on behalf of the FCA US LLC UAW Savings Plan ("UAW Plan") and the FCA US LLC Salaried Employees' Savings Plan ("Salaried Employees' Plan," and with the UAW Plan, the "Plans") and a proposed class ("Class") of participants and beneficiaries in the Plans, bring this action ("Action") under 29 U.S.C. § 1132, against Defendant, FCA US LLC ("FCA") for breaches of its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., and related breaches of applicable law beginning six years prior to the date the Action was filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just ("Class Period").[2]

2.      As employer-provided defined benefit plans have become increasingly rare as a meaningful benefit offered and available to employees of private companies, defined contribution plans (*e.g.*, 401(k) plans) qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, the country's *de facto* retirement system.  In traditional defined benefit retirement plans, a sponsoring employer

---

[1] This Amended Complaint is filed pursuant to the Stipulated Order Regarding Extending Time to File Answer to Complaint and Filing of Amended Complaint entered on October 17, 2025 (ECF No. 24).

[2] The initial Complaint in this Action named the Board of Directors of FCA US LLC ("Board") and the FCA US LLC Employee Benefits Committee ("Committee") as Defendants.  Pursuant to the Joint Stipulation Re: Monetary Judgment and Voluntary Dismissal of the Board of Directors of FCA US LLC and the FCA US LLC Employee Benefits Committee (ECF No. 17), Plaintiffs agreed to dismiss the Board and Committee from the case.  Since FCA likewise agreed in the same stipulation to be responsible for a final judgment based on the actions or omissions of the members of the Board and the Committee (whether individually or as a whole), Plaintiffs allege the roles and conduct of the Board and the Committee as relevant to Plaintiffs' claims.  Thus, FCA collectively with the Board and the Committee shall be referred to as "Defendants" in Plaintiffs' substantive allegations for ease of reference.

typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, since such an employer is responsible for any shortfall in funding to provide the benefits promised.  In the context of defined contribution plans, however, *participants* bear the risk of high fees and investment underperformance.

3.    As of December 31, 2022, the UAW Plan had 54,206 participants with account balances and assets totaling more than $4 billion, placing it in the top 0.1% of all U.S. defined contribution plans by plan participant count and by total assets.[3]  The Salaried Employees' Plan was similarly in the top 0.1% of all U.S. defined contribution plans, with 18,886 participants and assets exceeding $4 billion as of December 31, 2022.  Defined contribution plans with substantial assets, like the Plans, have significant bargaining power and can demand low-cost administrative and investment management services within the marketplace.  The market for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

4.    Defendants maintain the Plans, and are responsible for selecting, monitoring, and retaining the service providers that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe several well-defined duties to the Plans and their participants and beneficiaries, including obligations to act for the exclusive benefit of participants, select and maintain prudent and diverse investment options to offer through the Plans, and ensure that expenses paid by the Plans are fair and reasonable in relation to the services obtained.

---

[3] BrightScope and Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020*, September 2023, www.ici.org/files/2023/23-ppr-dcplan-profile-401k.pdf, last accessed on October 18, 2024.

5.     Defendants breached their fiduciary duties to the Plans.  As detailed below, Defendants failed to appropriately monitor the Plans' investments, resulting in the retention of unsuitable investments in the Plans instead of prudent alternative investments that were readily available at all times Defendants selected and retained the funds at issue and throughout the Class Period.  Since Defendants have the discretion to select the investments made available to participants, Defendants' breaches directly caused the losses alleged herein.

6.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plans and the proposed Class as the Court may deem appropriate and just under the circumstances.

7.     Plaintiffs specifically seek the following relief on behalf of the Plans and the Class:

   i.     A declaratory judgment holding that the acts of FCA and its appointees described herein violate ERISA and applicable law;

   ii.     A permanent injunction against FCA and its appointees prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plans and their participants and beneficiaries;

   iii.     Equitable, legal, or remedial relief for all losses and/or compensatory damages;

   iv.     Attorneys' fees, costs, and other recoverable expenses of litigation; and

   v.     Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

## II.   THE PARTIES

8.      Fulton is an employee of FCA and participant in the UAW Plan under 29 U.S.C. § 1002(7).  Fulton is a resident of Red Bud, Illinois.  During the Class Period, Fulton maintained an investment through the UAW Plan in the custom 2040 Target Date Fund.

9.      Bush is an employee of FCA and participant in the UAW Plan under 29 U.S.C. § 1002(7).  Bush is a resident of Rockford, Illinois.  During the Class Period, Bush maintained an investment through the UAW Plan in the custom 2030 Target Date Fund.

10.     Terrell is a former employee of FCA and a former participant in the Salaried Employees' Plan under 29 U.S.C. § 1002(7).  Terrell is a resident of Royal Oak, MI.  During the Class Period, Terrell maintained an investment through the Salaried Employees' Plan in the custom 2035 Target Date Fund and the Inst Money Market II Fund.

11.     Rogers is an employee of FCA and participant in the UAW Plan under 29 U.S.C. § 1002(7).  Rogers is a resident of Romulus, Michigan.  During the Class Period, Rogers maintained an investment through the UAW Plan in the custom 2035 Target Date Fund.

12.     FCA stands for Fiat Chrysler Automobile.  FCA is the American subsidiary of the multinational automotive company Stellantis N.V.  The company designs, engineers, manufactures, and sells vehicles under several brands, including Alfa Romeo, Chrysler, Dodge, Fiat, Jeep, and Ram.  FCA is headquartered in Auburn Hills, Michigan and sponsors the Plans.

13.     The Board appointed "authorized representatives" of FCA, including the Committee, as fiduciaries of the Plans.  Members of the Board are fiduciaries of the Plans under ERISA under 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

14.     The Committee is responsible for the general administration of the Plans and is a fiduciary under ERISA, 29 U.S.C. §§ 1002, 1102.  The Committee maintains its address at FCA's company headquarters in Auburn Hills, Michigan.  The Committee and its members are appointed by FCA or its delegate to administer the Plans on FCA's behalf.

### III.     JURISDICTION AND VENUE

15.     Plaintiffs seek relief on behalf of the Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and U.S.C. § 1132.

16.     This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

17.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because FCA's principal place of business is in this District and the Plans are administered in this District.  Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

18.     Plaintiffs have standing to bring the Action because assets attributable to their accounts in the Plans were invested in the unsuitable investment alternatives retained by Defendants during the Class Period and at issue in the Action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plans have suffered millions of dollars in losses due to Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  And although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all participants in the Plans also suffered financial harm as a result of

Defendants' retention of unsuitable investment options and were deprived of the opportunity to invest in suitable investment alternatives, among other injuries.

## IV.   FACTUAL ALLEGATIONS

### A.  BACKGROUND AND STRUCTURE OF THE PLANS

19.     The UAW Plan and the Salaried Employees' Plan are each participant-directed defined contribution plans, meaning participants direct the investment of their contributions into various investment options offered under the Plans.  Each participant's account is credited with their contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plans pays expenses from assets in the Plans, and the majority of administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The investment options made available to participants in the Plans include various mutual funds and collective trust funds.

20.     Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and required to provide certain investment and financial disclosures and information in the form of a prospectus.

21.     Collective trusts are, in essence, mutual funds without SEC regulation.  Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts were severely

restricted, giving rise to the more transparent and publicly-traded mutual funds described above. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plans.  Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts.  The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees.  Accordingly, large retirement plans are able to leverage their size for lower fees.

22.     During the Class Period, the Plans' assets were held in the FCA US LLC Defined Contribution Plan Master Trust by the Plans' trustee, Bank of America, N.A.  All investments and asset allocations are performed through this trust instrument.

**B.  TARGET DATE FUNDS**

23.     A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  These shifts occur along what is known as a TDF's "glide path."  TDFs offer investors dynamic, straightforward asset allocation, while providing both long-term growth and capital preservation.  All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time.

24.     TDF glide paths are managed either "to" or "through" retirement.  A "to retirement" glide path generally assumes participants will withdraw their funds once they reach the presumed retirement age, or soon thereafter.  The asset allocation of a "to retirement" TDF remains static once the retirement date is reached.  A "through retirement" glide path expects participants will remain invested after reaching retirement and gradually draw down on their

funds.  Accordingly, the terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.

25.     "To retirement" strategies are managed to protect against the risk of a market decline significantly diminishing assets, while the "through retirement" approach focuses on the risk of outliving savings.  Each strategy treats the other's primary focus as a secondary objective (*i.e.*, most "to" managers "have the objective of limiting portfolio volatility up to retirement as the primary goal, and the income throughout retirement is more of a secondary objective.").[4] TDFs designed to take investors to retirement typically de-risk faster than their "through retirement" peers, and while this may offer greater potential protection against downside risk, it leaves investors exposed to the potentially destructive, lasting consequences of running out of money in retirement.  As retirees trend toward keeping savings in their retirement plans post-retirement, "through retirement" glide paths have been more widely utilized.[5]  Indeed, of the 28 TDF suites launched in the past decade that remain active, nearly 80% adopt a "through" approach.[6]

26.     The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed.  This refers to a TDF's "implementation" and does not mean TDFs that are implemented with passively managed assets are not also actively managed.  TDFs comprised of primarily or entirely passive strategies provide broad market exposure at minimal cost and avoid the risk of active management underperformance and style drift.  TDFs filled with actively managed funds tend to provide more diversified asset class

---

[4] Amanda Umpierrez, *Evaluating 'To' vs. 'Through' Glide Paths*, PLANSPONSOR, (Feb. 17, 2021), https://www.plansponsor.com/in-depth/evaluating-vs-glide-paths/.

[5] *Id.*

[6] MORNINGSTAR, 2022 TARGET-DATE STRATEGY LANDSCAPE (2022).

exposure while offering the potential for excess returns, particularly in less efficient asset classes where active management tends to outperform.

## C.  DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

27.     As discussed below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plans in several ways.  Plaintiffs did not acquire actual knowledge regarding the breaches at issue here until shortly before the Action was filed.

### 1.   The Plan's Unsuitable Investment Options

28.     The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant index or indices.[7]  It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment or the needs of an investor.  The Capital Asset Pricing Model ("CAPM")—which is a well-established model used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following

---

[7] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC, February 16, 2023, available at https://smartasset.com/financial-advisor/active-management (last accessed Nov. 11, 2024) ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers"); Lehman and Modest, *Mutual Fund Performance Evaluation: A Comparison of Benchmarks and Benchmark Comparisons*, Journal of Finance, Vol. XLII, No. 2, June 1987 (evaluating the performance of benchmarks using CAPM and APT, and explaining that the entire purpose of actively managed mutual funds is to exceed the performance of an index/benchmark); Baks, Metrick, and Wachter, *Should Investors Avoid All Actively Managed Mutual Funds? A Study in Bayesian Performance Evaluation*, Journal of Finance, Vol. LVI, No. 1, February 2001 (observing that, since Jensen in 1968, "most studies have found that the universe of mutual funds does not outperform its benchmarks after expenses" and "evidence indicates that the average active mutual fund should be avoided"); Jensen, *The Performance of Mutual Funds in the Period 1945-1964*, Vol. XXIII, No. 2, May 1968 (explaining that most actively managed mutual funds do not outperform indexes and that only those that outperform indexes can justify the risk and expense from an economic perspective).

mathematical formula for this principle:

$$ERi = Rf + \beta i(Erm - Rf), \text{ where:}$$

$ERi$ = the expected return of the investment

$Rf$ = the risk-free rate

$\beta i$ = the beta of the investment

$(Erm - Rf)$ = the market risk premium

29.     Applied here, the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—$ERi$—is, at the very least, above that of its benchmark, $Rf$.[8]  Otherwise, the model collapses, and it would be economically irrational to assume the extra risk without achieving a higher return than the benchmark.

30.     Said otherwise, CAPM specifically contemplates the comparison of an investment to an applicable benchmark.  Accordingly, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively managed investment attempts to beat) is somehow inappropriate or an "apples to oranges" comparison in every instance ignores the fundamental purpose and design of active mutual funds, and is inconsistent with basic investment theory and the prevailing frameworks employed by prudent fiduciaries.

31.     Indeed, prudent fiduciaries should compare actively managed funds to passively managed funds or similar indices in order to determine whether a plan is getting the additional

---

[8] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.  The Arbitrage Pricing Theory ("APT") likewise dictates the same result.

return to justify the increased expense and risk of the active investment.  This, in addition to other metrics (such as peer relative performance), is exactly what every minimally competent investment professional does to evaluate an actively managed investment and arguments or suggestions to the contrary fall far outside mainstream thought in terms of investment management, basic economics and minimum standards of fiduciary care and prudence.  Indeed, in promulgating its Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans in February 2012, the Department of Labor ("DOL") specifically required that plan sponsors identify benchmarks in the form of an appropriate broad-based securities market index for each investment offered in the plan, thus specifically recognizing that actively managed investments must be evaluated against indexes, for which passively managed index funds serve as an investable proxy.  Performing such a comparative analysis is not merely intended to determine whether a plan would be better served by a passively managed investment, but rather whether an actively managed fund is providing value sufficient to justify its retention.

32.    Market research has indicated that investors should be skeptical of certain actively managed funds' ability to consistently outperform their indices, which is a significant concern for long-term investors saving for retirement, like participants in the Plans and their beneficiaries.  Indeed, Morningstar, a respected sourced of investment information, has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[9]  Although they may experience

---

[9] Ben Johnson, *How Actively and Passively Managed Funds Performed: Year-End 2018*, MORNINGSTAR (Feb. 12, 2019), www.morningstar.com/insights/2019/02/12/active-passive-funds.  *See also* Kilroy, Is Active Management a Good Idea for Your Portfolio (SmartAsset Advisor, LLC) (December 11, 2019), https://smartasset.com/financial-advisor/active-management.  There is controversy around the performance of active managers and if they produce superior returns. In fact, over the past 15 years, 92.43% of large-cap managers, 95.13% of mid-cap managers, 97.70% of small-cap managers failed to surpass their benchmark index.

success over shorter periods, active fund managers are infrequently able to time their activity efficiently enough to outperform the market.  This is not to suggest that active management is inappropriate for use in a retirement plan lineup, but that plan fiduciaries must carefully analyze each active fund's ability to provide value and, if they deem a fund does not, replace it with an active or passive fund that has demonstrated such capabilities.  To be clear, the Complaint does not challenge the selection of actively managed investments and does not challenge active management specifically or in general.  As explained above, there is nothing inherently wrong with choosing actively managed funds, as long as the expected return of the fund justifies the increased expense and risk, as compared to other readily available investment options.  In other words, to justify choosing an actively managed investment, fiduciaries of a retirement plan must, at a minimum, engage in rational economic decision-making to justify the more expensive and inherently riskier investment.  Since the fiduciaries here employed a fundamentally irrational decision-making process (*i.e.*, inconsistent with their duty of prudence), they breached their fiduciary duties under ERISA, which are the "highest known to law."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (citations omitted).

33.     In this environment, prudent fiduciaries scrutinize investment managers to determine whether an active manager has presented an ability to exploit inefficiencies in their chosen sector of the market.  To do so, and to distinguish between a skilled manager and a lucky one, fiduciaries judge fund performance against both an appropriate index benchmark and a universe of similar funds over periods most closely approximating a market cycle—namely, three- and five-year intervals.  These time horizons are emphasized by virtually all competent investment professionals as sufficient to gauge a fund manager's ability to execute their strategy.

Also, over three years, active managers underperformed the market by 0.36%.

In addition, these two specific time horizons (three- and five-year trailing performance) are the specific time frames that almost all investment policy statements identify as the most important to review in connection with defined contribution investments.[10]

34.     A prudent investment monitoring process will regularly review fund performance against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods, as well as several preceding three- and five-year periods, in order to discern any pattern of underperformance.  Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and/or the median return of its peers, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.

35.     Index comparisons are particularly important in the efficient U.S. large cap space. As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those funds that simply track the benchmark.  The domestic large cap space is particularly difficult—Morningstar concluded in its year-end 2018 report on active versus passive management that long-term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time

---

[10] Although it may be tempting to somewhat simplistically suggest that 10-year performance, for example, is more important since the plans at issue are retirement plans intended for the long term, such a suggestion is at odds with prevailing practices for at least several important reasons: (1) waiting for 10 years to determine whether the performance of an investment is acceptable is simply too long because losses that can accrue over such a prolonged period can be devastating to an investor and are almost always unrecoverable given the resulting deficits and impact of compounding; (2) in light of labor market flexibility in the United States (with the average employee holding a position for slightly more than four years, *i.e.*, between three and five years), the average participant does not remain invested in the same 401(k) plan or retirement instruments for as long as 10 years, *see* Department of Labor, Bureau of Labor Statistics News Release: Employee Tenure in 2022 (September 22, 2022), https://www.bls.gov/news.release/pdf/tenure.pdf; and (3) the average market cycle is less than 10 years and, therefore, as a matter of investment theory and management, it is not the most important or meaningful benchmark with respect to performance.

horizons) were lowest among U.S. large cap funds.  Accordingly, prudent fiduciaries are concerned with actively managed funds' ability to add value in excess of the benchmark, particularly with the domestic large cap strategies.

### i.      The US Large Cap Equity Fund

36.      The US Large Cap Equity Fund ("Large Cap Equity Fund") is a custom investment fund managed exclusively for the Plan, which opened for investment in January 2013.  The Large Cap Equity Fund portfolio comprises three component strategies: Lazard US Equity Concentrated, Jacobs Levy Large Cap Growth, and LSV US Large Cap Value Equity. The fact sheet for the Large Cap Equity Fund that is available to the Plans' participants through the Plans' online portal identifies the S&P 500 Index as the benchmark and classifies the fund in the Large Blend Morningstar category.  The fact sheet also notes that the Large Cap Equity Fund has the objective of outperforming the S&P 500 Index over a full market cycle.

37.      The Large Cap Equity Fund was retained as an investment option under the Plans despite an inability to support an expectation of performance sufficient to justify its retention, including as evidenced by its consistent and significant underperformance relative to its benchmark (representing a failure to meet the fund's own articulated objective) and peer strategies.  However, due to the Committee's deficient investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or a general attitude of neglect toward the Plan, Defendants failed to appropriately scrutinize, and ultimately replace the investment.  The below performance data represent information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries.[11]

---

[11] Performance data for the Plans' custom investments are not publicly available, and the returns information furnished to participants is limited to year-end annual, five-year, and ten-year periods.  No three-year returns for the Plans' custom investments are accessible to participants.

38.     By the start of the Class Period, the Large Cap Equity Fund had a sufficient performance history to enable evaluation of its five-year returns.[12] Despite the fund's professed target of outperforming its benchmark over a market cycle,[13] as of December 31, 2018, the Large Cap Equity Fund's five-year annualized return trailed that of the benchmark by 1.17% (equivalent to a **6%** cumulative deficit).[14] Moreover, the fund's five-year performance similarly lagged the median return of the Large Blend peer group. A fiduciary prudently monitoring the Large Cap Equity Fund, which lacked a long term track record of success, would be cognizant of Morningstar's aforementioned conclusion that domestic large cap funds struggle to achieve long-term success over the benchmark and, in concert with the fund's stated intention to generate returns that exceeded the benchmark, would have recognized the fund's performance shortcomings and sought to investigate whether the underperformance was likely to abate. The prevailing standard of care for investment monitoring demands awareness and consideration of rolling performance to identify trends of out- or underperformance. Underperformance over a three- or five-year period is a cause for concern and scrutiny, and can itself be reason enough to

---

Nor are historical five-year returns as of the first, second, and third quarters-end of each year. Accordingly, Plaintiffs cannot reconstruct the quarter-by-quarter rolling analysis customarily performed by competent investment professionals and plan fiduciaries. Nonetheless, the data available would be sufficient to suggest to any prudent fiduciary that the investment alternatives at issue were unable to support an expectation of performance sufficient to justify their retention.

[12] The Large Cap Equity Fund was only created in January 2013, and thus did not have a five-year return until January 2018. As performance information is only available to participants as of December 31 of each year, the Large Cap Equity Fund's first five-year return visible to participants was as of December 31, 2018.

[13] To reiterate, three- and five-year periods are widely accepted as the closest proxy for a market cycle and are, thus, sufficient to evaluate a fund manager's skill in executing their strategy.

[14] All returns cited in the Complaint are annualized, meaning the differences in the returns realized by a Plan investment and its benchmark or peer group are equivalent to the specific difference in *each* of the years in the period *compounded*. For example, the 1.17% annualized shortfall of the Large Cap Equity Fund compared to its benchmark over the five years ended December 31, 2018 is equivalent to an approximately 6% cumulative deficit.

remove an investment from a plan.  In any event, prudent fiduciaries will seek to understand the reasons for the underperformance and closely monitor the investment to see if it subsequently outperforms.[15]  Underperformance over several consecutive three- or five-year trailing periods is a cause for both alarm and action.

39.     The Large Cap Equity Fund's underperformance relative to the market segment in which it operates, as well as similar strategies operating in that same market segment, persisted, as detailed below.  The Large Cap Equity Fund's repeated failure to generate long-term returns that exceeded the benchmark should have been sufficient to convince a fiduciary prudently monitoring its performance to remove the troubled investment; that the fund was retained by the Committee despite persistently demonstrating such shortcomings while regularly failing to exceed the peer median return represents a severe breach of fiduciary duty.

40.     The worrying signs associated with the Large Cap Equity Fund continued from the start of the Class Period, indicating the Committee failed to recognize or act to remove the flailing custom investment.  As illustrated in the chart below, per the data available to Plaintiffs, the Large Cap Equity Fund has failed to produce a five-year return to beat the benchmark—the fund's stated goal—in *any* year of the Class Period.  Indeed, by 2023, the Large Cap Equity Fund had been in operation for ten years; its ten-year annualized return as of December 31, 2023 trailed that of the benchmark by 1.22%, or **12.89%** cumulatively.  Similarly, the Large Cap Equity Fund trailed the peer median five-year return in five of the six periods for which data was available to Plaintiffs, and its ten-year return lagged the median ten-year return of the Morningstar Large Blend category.

---

[15] It should be noted that "improved" or lessening underperformance over time is still just that: underperformance.  A fund manager that persistently fails to outperform, however great or slight the underperformance, persistently fails to add value.

**Table 1**

| | | | | | |
|---|---|---|---|---|---|
| | | **Five-Year Returns – Large Cap Equity Fund vs. Benchmark and Peers** | | | |
| **As of** | **Large Cap Equity Fund** | **S&P 500** | **Large Blend Category** | **Beat Benchmark?** | **Beat Peer Median?** |
| Q4 2018 | 7.32% | 8.49% | 7.43% | No | No |
| Q4 2019 | 11.10% | 11.70% | 10.56% | No | Yes |
| Q4 2020 | 13.29% | 15.22% | 14.01% | No | No |
| Q4 2021 | 16.94% | 18.47% | 17.23% | No | No |
| Q4 2022 | 8.68% | 9.42% | 8.73% | No | No |
| Q4 2023 | 14.42% | 15.69% | 14.70% | No | No |

41.     Had the Committee engaged in an appropriate ongoing review of the Large Cap Equity Fund, it would have been aware of the fund's performance shortcomings against the benchmark and its persistent inability to beat the peer median, which both stretched back several years and would have been readily apparent on a shorter-term basis prior to the fund having a five-year performance history.  The foregoing trend represented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the Large Cap Equity Fund, as sustained underperformance is the clearest indication of a manager's inability to provide value.  However, Defendants ignored or were otherwise unaware of the troubling pattern of rolling returns, failed to investigate a replacement for the Large Cap Equity Fund, and allowed it to linger in the Plans even as its performance issues persisted.

42.     As is clearly exhibited by the consistently weak performance shown in the chart above, the Large Cap Equity Fund has never been an appropriate investment option for the Plan. It continues to underperform both the benchmark and the peer median: as of June 30, 2024, the Large Cap Equity Fund's five-year returns trailed those of its benchmark by 2.54% annualized and those of the median peer by 1.40% annualized.  The fund's ten-year returns similarly lag both the index and the category.  When an investment option's track record is so poor, as is apparent here, Defendants should have necessarily replaced the fund in the Plans with an

alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, in such an efficient segment of the market, retain an alternative that tracks the benchmark.  The Plans offered a US Large Cap Equity Index Fund that tracks the returns of the S&P 500 Index for the duration of the relevant period, rendering it entirely unnecessary, and harmful to participants, to retain a persistently underperforming actively managed strategy in the same market segment.

43.    Despite transparent and persistent red flags, Defendants failed to appropriately monitor the Large Cap Equity Fund throughout the Class Period and neglected to replace the underachieving investment option, in a severe breach of fiduciary duty.

### ii.    The Custom Target Date Funds

44.    The Plans have offered a suite of 12 custom TDFs ("FCA TDF(s)") since their inception in January 2013.  The FCA TDFs are significantly worse performing than the broader TDF marketplace, their own benchmarks, and industry benchmarks, and, throughout the Class Period, could not have supported an expectation by prudent fiduciaries that their retention in the Plans was justifiable.

45.    The underlying portfolio of each FCA TDF is comprised of approximately 25 sub-funds.  It is not clear from the fact sheets and other materials available to participants what entity or firm is responsible for determining the asset allocation for the suite.  The series' glide path is managed "through retirement."

46.    The trend for sponsors of large retirement plans, according to Jake Gilliam, head of multi-asset solutions at Charles Schwab, has been toward off-the-shelf TDFs and away from custom solutions like those offered in the Plan, due to a desire to keep costs and complexity to a

minimum.[16]

47.     Defendants were responsible for crafting the Plans' investment lineup and could have chosen any off-the-shelf target date family but, in electing to create and offer the FCA TDFs, instead made the imprudent decision that has deprived the Plans' participants of significant growth in their retirement assets, resulting in losses of millions of dollars.  Defendants need not have scoured the market to find the best alternative target date suite; however, participant retirement savings would have been substantially augmented by investing in several of the top available target date families.  TDF assets are heavily concentrated among a handful of managers, many of which provide a clearly superior option to the FCA TDFs.  Any objective evaluation of the FCA TDFs should have resulted in the selection of a more consistent, better performing, and more appropriate TDF suite.

48.     Exacerbating the Committee's imprudent decisions to retain the FCA TDFs is the suite's designation as the Plan's Qualified Default Investment Alternative ("QDIA").  Under DOL regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets.  If participants do not indicate where their assets should be invested, all contributions are automatically invested in the QDIA.  For this reason, it is vital for fiduciaries to understand the relevant plan participant population and ensure the QDIA is a suitable option.  Indeed, the Plans' fiduciaries are responsible for the prudent selection and continuous monitoring of an appropriate QDIA.  The FCA TDF with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) has served as the QDIA in the Plans

---

[16] Lee Barney, *Benchmarking Custom TDFs Is Not an Exact Science*, PLAN SPONSOR (Feb 23, 2021), https://www.plansponsor.com/in-depth/benchmarking-custom-tdfs-not-exact-science/.

throughout the Class Period.

49.     Given that the vast majority of the Plans' participants are not sophisticated investors, many, by default, concentrate their retirement assets in TDFs.  As such, the impact of the Committee's imprudent selection and retention of the FCA TDFs is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2022, approximately 49% of the Plan's assets were invested in the FCA TDFs.

a.      Benchmark and Peer Group Comparisons

50.     As an evaluative tool, prudent fiduciaries will assess a TDF's risk and return characteristics compared to the TDF industry at large.  The managers of the FCA TDFs, like those of many TDF suites, have designed a custom benchmark against which their performance can be assessed.  For each TDF vintage, the FCA Custom Blend benchmark is a weighted mix of several market indices that are representative of the asset classes in which the FCA TDFs invest.  Which indices comprise the custom benchmark, and in what weightings, is opaque to participants.  As the composite benchmark simply mirrors the overall strategy of the series and fails to demonstrate how the investment is performing relative to peers, it is an imperfect tool to evaluate the soundness of the investment.  Rather than demonstrate the investment merits of the FCA TDFs in relation to the broader TDF market, as, for example, can be achieved (and is commonly performed) by utilizing the S&P 500 Index to benchmark a domestic large cap equity fund (like the Large Cap Equity Fund), the FCA Custom Blend benchmark merely reflects the managers' ability to execute their own particular strategy without regard for the wisdom of that strategy or the relative performance of that strategy, as compared to the strategies of other like investments.

51.     According to Morningstar, the S&P Target Date Indices ("S&P Indices") are the

most common benchmark used to approximate the performance of the TDF industry.  The S&P Indices, which include a separately calculated index for each target date, each "measure[] the performance of sub-indices selected and weighted to represent a consensus of the opportunity set available in the U.S. universe of target date funds."[17]  As a composite of the strategies and styles present in the broad universe of investable alternative TDFs, the S&P Indices represent an appropriate, meaningful benchmark comparator for the FCA TDFs.  As each distinct TDF suite necessarily takes a different approach to achieving the same objective (*i.e.*, preparing investors for retirement by a particular date), the S&P Indices provide an amalgamation of the different characteristics of TDF strategies: TDFs with actively and passively managed underlying funds, TDFs with different risk profiles, and, to state the obvious, those with different asset allocations, as distinguishable TDF suites have varying mixes of stocks, bonds and cash.  Accordingly, the S&P Indices are the most widely used TDF benchmark by investment managers and informed retirement plan fiduciaries.

52.    Accordingly, prudent plan fiduciaries would undertake an evaluation of the performance of the FCA TDFs against both the FCA Custom Blend benchmarks and the S&P Indices, in addition to peer TDFs classified by vintage in the same Morningstar category, as indicated in the fact sheets made available to participants.

53.    Similar to the Large Cap Equity Fund, by the start of the Class Period, the FCA TDFs had a sufficient performance history to enable evaluation of the suite's five-year returns.[18]

---

[17] S&P Target Date Index Series Methodology (June 2022).

[18] Virtually all competent investment advisors emphasize that fiduciaries should focus on three- and five-year returns to evaluate the performance of an investment over periods most closely approximating a market cycle, and persistent poor performance over those periods demands investigation and action by fiduciaries (and, as noted above, Plaintiffs were not furnished with three-year returns data for the Plan's custom investments, which was also not publicly available).

As of December 31, 2018,[19] while more than half of the vintages outperformed their respective Custom Blend Benchmark on a five-year annualized basis, every vintage except the Retirement Income (for participants already in retirement) failed to beat its respective S&P Index and the median return of all peer TDFs.  A fiduciary prudently monitoring the FCA TDFs, which lacked a long-term track record of exceeding benchmarks and outperforming the average peer, would have acknowledged the suite's concerning performance issues and evaluated whether its relative returns were likely to improve.

54.     The performance of the FCA TDFs according to standard criteria, including those identified in the fund fact sheets furnished to participants, worsened, and a majority of vintages in the suite failed to meet **any** of the three standards—failing to exceed the returns of the Custom Blend Benchmark, the S&P Index, or the peer median return—on a five-year basis for the remainder of the relevant period, as shown in the chart below.[20]

---

Any suggestion that a TDF has a lifespan of 10 or 25 years and, therefore, performance metrics of three to five years should not be considered is nonsensical because (a) at any point in time, many vintages of TDFs have shorter lifespans than 10, and especially 25, years, (b) most importantly, in light of employment mobility in the United States (with the average employee holding a position for slightly more than four years), competent and informed fiduciaries understand that many participants will not maintain their TDF investments within a defined contribution plan such as the Plans until the actual target date of the given investment, and (c) failing to replace an unsuitable TDF for more than five years could put the retirement savings of plan participants at a nearly irrecoverable deficit.  Thus, three- and five-year performance is paramount in the minds of any competent fiduciary of a retirement plan.

[19] The FCA TDFs were only launched in January 2013, and thus did not have a five-year return until January 2018.  As performance information is only available to participants as of each December 31, the FCA TDFs' first five-year return visible to participants was as of December 31, 2018.

[20] Prior to 2021, participant-facing materials provided the returns of the Lipper Mixed-Asset Target Funds Average for comparative purposes.  These are shown in the returns matrix in place of the FCA Custom Blend benchmark for periods in which the Lipper Mixed-Asset Target Funds Average was provided to participants as the relevant benchmark.

**Table 2**

| Five-Year Returns | | Q4 2018 | Q4 2019 | Q4 2020 | Q4 2021 | Q4 2022 | Q4 2023 |
|---|---|---|---|---|---|---|---|
| Retire | Beat Custom Blend Benchmark | Yes | Yes | Yes | No | No | Yes |
| | Beat S&P Target Date Index | Yes | No | Yes | Yes | Yes | Yes |
| | Beat Peer Median | Yes | Yes | Yes | Yes | Yes | Yes |
| 2015 | Beat Custom Blend Benchmark | Yes | Yes | Yes | No | No | No |
| | Beat S&P Target Date Index | No | No | Yes | Yes | Yes | Yes |
| | Beat Peer Median | No | No | Yes | Yes | Yes | Yes |
| 2020 | Beat Custom Blend Benchmark | Yes | Yes | Yes | No | No | No |
| | Beat S&P Target Date Index | No | No | Yes | Yes | Yes | Yes |
| | Beat Peer Median | No | No | No | No | Yes | Yes |
| 2025 | Beat Custom Blend Benchmark | Yes | Yes | Yes | No | No | No |
| | Beat S&P Target Date Index | No | No | No | No | Yes | Yes |
| | Beat Peer Median | No | No | No | No | Yes | Yes |
| 2030 | Beat Custom Blend Benchmark | Yes | No | No | No | No | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | Yes | No |
| 2035 | Beat Custom Blend Benchmark | Yes | No | No | No | No | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | No | No |
| 2040 | Beat Custom Blend Benchmark | Yes | No | No | No | No | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | No | No |
| 2045 | Beat Custom Blend Benchmark | No | No | No | No | Yes | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | No | No |
| 2050 | Beat Custom Blend Benchmark | No | No | No | No | Yes | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | No | No |
| 2055 | Beat Custom Blend Benchmark | No | No | No | No | Yes | No |
| | Beat S&P Target Date Index | No | No | No | No | No | No |
| | Beat Peer Median | No | No | No | No | No | No |
| 2060 | Beat Custom Blend Benchmark | | | | | | No |
| | Beat S&P Target Date Index | | | | | | No |
| | Beat Peer Median | | | | | | No |

55.     Indeed, by 2023, once the FCA TDFs had been in operation for ten years, virtually all vintages failed to beat the ten-year returns of the FCA Custom Blend benchmark, the S&P Indices, and the peer median.  Had the Committee engaged in an appropriate review of the FCA TDFs, it would have been aware of the suite's performance shortcomings against relevant benchmarks and its persistent inability to beat the peer median, which both stretched back several years and would have been readily apparent on a shorter-term basis prior to the fund

having a five-year performance history.  As is clearly exhibited by the consistently weak performance shown above, the FCA TDFs have never been an appropriate investment option for the Plan, and the suite continues to underperform across evaluative metrics.

b. <u>Specific Comparator TDFs</u>

56. In addition to standard benchmarks and the broad peer universe, measured against available alternative TDFs pursuant to the frameworks employed by prudent fiduciaries, the FCA TDFs also are a vastly inferior retirement solution and could not have been justifiably retained in the Plans.  Throughout the Class Period, there were many TDF offerings that consistently and dramatically outperformed the FCA TDFs, providing investors with substantially more capital appreciation.  It is apparent, given the continued retention of the FCA TDFs in the Plans' investment menu, that the Committee failed to scrutinize the performance of the FCA TDFs against any alternatives in the TDF marketplace, or consider the suite's standing in the broader TDF market, in order to determine whether the expected performance of the FCA TDFs could support their continued retention in the Plans.  Accordingly, the Plans' investment in the FCA TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in several alternative TDFs available off-the-shelf.

57. Prudent fiduciaries evaluate TDF returns against an appropriate index, a broad group of all peer TDFs, and also specific, readily investable alternatives, to ensure that participants are benefiting from the current TDF offering.  In addition to consideration of broader benchmarks, it is incumbent on plan fiduciaries and a component of the applicable standard of care throughout the Class Period to assess TDFs against readily available alternatives to ensure that participants are best served by the options available to them.

58.     This is particularly important in the context of the TDF market.  Investment advisors considering investments for addition to a retirement plan lineup regularly apply initial screens that investments must pass to be considered for addition to a plan lineup, including requiring that candidate funds have sufficient assets under management ("AUM") such that the plan's assets would not represent a disproportionately large share of the fund's assets.

59.     The TDF market is particularly top heavy; by the end of 2021, the top five largest TDF series managed approximately 70% of all TDF assets.  Accordingly, most of the TDF suites available for investment would fail initial AUM screening criteria applicable to the Plan.  Indeed, given the Plan's approximately $4 billion in the FCA TDFs by the end of 2022, only the largest available series would represent realistic alternatives in the TDF universe.  In light of the structure of the TDF marketplace, it would not be relevant to compare the FCA TDFs to specific TDF series with significantly smaller levels of AUM.

60.     The five largest TDF series dominate the market:

**Table 3**

| Target Date Series | Mutual Fund ($B) | CIT ($B) | Total ($B) | Market Share |
|---|---|---|---|---|
| Vanguard Target Retirement | 660 | 530 | 1,190 | 36.4% |
| T. Rowe Price Retirement | 180 | 170 | 350 | 10.7% |
| BlackRock LifePath Index | 61 | 226 | 287 | 8.8% |
| American Funds Target Date Retirement | 239 | 9 | 248 | 7.6% |
| Fidelity Freedom | 221 | - | 221 | 6.8% |

61.     Accordingly, the suites shown above (the "Comparator TDFs") represent an ideal group for comparison, as they represent the most likely alternatives to be considered were the FCA TDFs to be replaced with an off-the-shelf product.  This is not to suggest each of the Comparator TDFs represents a prudent or appropriate replacement without additional evaluation, but only that they represent the largest, most well known providers in the TDF space and therefore would be used as points of comparison by any fiduciary evaluating a custom TDF

solution. It bears noting that hundreds of retirement plan fiduciaries select a new TDF suite each year; conducting such a search is simply not possible without measuring TDFs with different styles, strategies, risk profiles and asset allocations (discussed in further detail below) against one another. Indeed, the Comparator TDFs include suites with both "to" and "through" glide paths, as well as both active and passive underlying strategies.

62. Prudent fiduciaries are aware of the major offerings in the asset classes represented in a plan. This is all the more important as it relates to a plan's QDIA, given the gravitation of plan assets to the QDIA and importance of the QDIA to the overall design of a plan's investment menu. In fact, the Committee could have sought comparative returns data and other metrics for each of the Comparator TDFs in real-time throughout the Class Period from its investment advisor, or easily obtained it through just a few clicks of a computer mouse. When evaluated against the Comparator TDFs (both individually and as a group), the returns of the FCA TDFs over relevant trailing periods consistently and substantially paled in comparison to those of the readily available alternatives. Accordingly, the analytical frameworks employed by prudent fiduciaries could not have supported a determination that the expected returns of the FCA TDFs would justify their retention in the Plan.

63. The below comparative performance data represents information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries. At any point during the Class Period, such data, in addition to the comparative datapoints of the benchmarks and the broad peer universe, would have been sufficient to convince a fiduciary following a prudent process to investigate alternatives and ultimately replace the FCA TDFs.

**Table 4**

| Q4 2018 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FCA TDF | 3.15% | 3.63% | 3.84% | 3.98% | 4.12% | 4.26% | 4.23% | 4.20% | 4.13% | 4.14% | |
| Best Comparator TDF | 3.36% | 4.28% | 4.69% | 5.00% | 5.63% | 5.95% | 6.05% | 6.17% | 6.19% | 6.17% | |
| Worst Comparator TDF | 2.95% | 4.03% | 3.70% | 4.00% | 4.27% | 4.51% | 4.70% | 4.80% | 4.82% | 4.81% | |
| FCA Rank | 3 (of 4) | Worst (of 5) | 5 | Worst | Worst | Worst | Worst | Worst | Worst | Worst | |
| Q4 2019 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
| FCA TDF | 4.66% | 5.38% | 5.74% | 6.07% | 6.42% | 6.86% | 7.16% | 7.23% | 7.23% | 7.25% | |
| Best Comparator TDF | 5.30% | 6.35% | 7.06% | 7.60% | 8.10% | 8.99% | 9.30% | 9.45% | 9.55% | 9.54% | |
| Worst Comparator TDF | 4.27% | 5.59% | 6.37% | 6.40% | 7.04% | 7.63% | 8.14% | 8.41% | 8.41% | 8.38% | |
| FCA Rank | 3 (of 4) | Worst (of 5) | Worst (of 5) | Worst | Worst | Worst | Worst | Worst | Worst | Worst | |
| Q4 2020 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
| FCA TDF | 7.34% | 8.07% | 8.48% | 8.85% | 9.19% | 9.70% | 10.03% | 10.30% | 10.36% | 10.33% | |
| Best Comparator TDF | 7.95% | 9.02% | 9.81% | 10.63% | 11.34% | 12.44% | 12.99% | 13.22% | 13.36% | 13.35% | |
| Worst Comparator TDF | 6.17% | 7.78% | 8.57% | 9.19% | 10.02% | 10.81% | 11.48% | 11.97% | 12.10% | 12.09% | |
| FCA Rank | 2 (of 4) | 3 (of 5) | Worst (of 5) | Worst | Worst | Worst | Worst | Worst | Worst | Worst | |
| Q4 2021 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
| FCA TDF | 7.84% | 8.58% | 8.90% | 9.25% | 9.63% | 10.28% | 10.86% | 11.35% | 11.53% | 11.44% | |
| Best Comparator TDF | 8.12% | 9.47% | 10.43% | 11.51% | 12.53% | 13.97% | 14.75% | 15.02% | 15.17% | 15.17% | |
| Worst Comparator TDF | 5.76% | 7.71% | 9.26% | 9.54% | 10.74% | 11.88% | 12.88% | 13.55% | 13.62% | 13.61% | |
| FCA Rank | 2 (of 4) | 3 (of 5) | Worst (of 5) | Worst | Worst | Worst | Worst | Worst | Worst | Worst | |
| Q4 2022 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | |
| FCA TDF | 3.51% | 3.63% | 3.77% | 3.82% | 3.86% | 4.14% | 4.40% | 4.75% | 4.88% | 4.78% | |
| Best Comparator TDF | 2.75% | 4.00% | 4.21% | 4.69% | 5.09% | 5.88% | 6.10% | 6.11% | 6.04% | 5.87% | |
| Worst Comparator TDF | 1.65% | 2.80% | 3.14% | 3.25% | 3.85% | 4.34% | 4.74% | 5.14% | 5.18% | 5.18% | |
| FCA Rank | Best | 2 (of 4) | 3 (of 5) | 3 | 5 | Worst | Worst | Worst | Worst | Worst | |
| Q4 2023 | Retire | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
| FCA TDF | 6.48% | 6.93% | 7.25% | 7.42% | 7.70% | 8.29% | 9.01% | 9.65% | 9.99% | 9.92% | 9.91% |
| Best Comparator TDF | 5.68% | 7.02% | 7.64% | 8.44% | 9.25% | 10.39% | 11.21% | 11.35% | 11.49% | 11.59% | 11.58% |
| Worst Comparator TDF | 3.64% | 6.00% | 6.61% | 6.68% | 7.91% | 9.07% | 9.99% | 10.76% | 10.93% | 10.92% | 10.92% |
| FCA Rank | Best | 2 (of 4) | 2 (of 5) | 5 | Worst | Worst | Worst | Worst | Worst | Worst | Worst |

64. Among the Comparator TDFs, for the periods referenced above, which span the relevant period, all FCA TDF vintages dated 2035 and longer ranked last in **every single window**, the 2030 vintage ranked last in all but one period (in which it ranked second last), the 2020 and 2025 vintages ranked in the bottom half of the set in all but one window, and the 2015 vintage ranked in the bottom half in four of six windows. Such persistent underperformance should have rang alarm bells for prudent fiduciaries. The FCA TDFs' inability to generate returns to beat any measuring stick, including its own custom benchmark, the most widely used TDF benchmark, the broad universe of all TDFs, and the specific, most prominent off-the-shelf TDFs, represented overwhelming and consistent evidence that they could not provide superior returns (and were costing the Plans' participants tens of millions of dollars in potential appreciation).

65.     Again, the above information was readily obtainable and computable by the Committee in real time throughout the relevant period.  The Committee, however, neglected to undertake any analysis of the FCA TDFs against specific peers using the above or other important performance metrics.  That the FCA TDFs were retained as an investment option in the Plans in spite of their persistent failure to satisfy any performance standard, peer-relative or against a benchmark, is a transparent indication that Defendants ignored or were otherwise unaware of the suite's deplorable pattern of rolling returns.  The FCA TDFs have never been an appropriate investment option for the Plan, much less in the role as the QDIA.  If the Committee had taken its fiduciary duties seriously during the Class Period and acted consistent with the minimum fiduciary standards of care, it would have replaced the FCA TDFs with a suitable alternative TDF.  Its failure to do so caused the Plans' participants to miss out on substantial investment returns for their retirement savings.

## V.     ERISA'S FIDUCIARY STANDARDS

66.     ERISA imposes strict fiduciary duties of prudence and loyalty on the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> (1)     a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

67.    Under 29 U.S.C. § 1103(c)(l), as relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to plan participants and their beneficiaries and defraying reasonable expenses of administering the plan.

68.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

69.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Chao*, 285 F.3d at 426 (citations omitted). The retention of unsuitable investments in a retirement plan implicates both duties. As was the case here, the failure to react to real time indicia that an investment is unsuitable for a plan is imprudent. The ultimate retention of such an investment, however, is also disloyal as it subordinates the interests of plan participants to those of other parties, including the managers of the investments at issue who collect management fees and otherwise benefit from a plan's assets being invested in the funds.

70.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any

breach of duty. Specifically, Section 405(a) of ERISA states:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

71.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA states, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    CLASS ALLEGATIONS

72.    This Action is brought as a class action by Plaintiffs, on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the FCA US LLC UAW Savings Plan and the FCA US LLC Salaried Employees' Savings Plan at any time on or after November 26, 2018, and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any

other judicial officer having responsibility for this.

73.     This Action may be maintained as a class action under Rule 23 of the Federal

Rules of Civil Procedure.

74.     **Numerosity.**  Plaintiffs are informed and believe that there are at least thousands

of Class members throughout the United States.  As a result, the members of the Class are so

numerous that their individual joinder in this Action is impracticable.

75.     **Commonality.**  There are numerous questions of fact and/or law that are common

to Plaintiffs and all members of the Class, including the following:

(1)     Whether Defendants failed and continue to fail to discharge their
duties with respect to the Plan solely in the interest of the Plan's
participants for the exclusive purpose of providing benefits to
participants and their beneficiaries;

(2)     Whether Defendants breached their fiduciary duties under ERISA
by failing to (a) act with the care, skill, prudence, and diligence of a
prudent person; (b) diversify the investments of the plan so as to
minimize the risk of large losses; (c) act in accordance with the
documents and instruments governing the Plan; and

(3)     Whether and what form of relief should be afforded to Plaintiffs and
the Class.

76.     **Typicality.**  Plaintiffs, who are members of the Class, have claims that are typical

of all members of the Class.  Plaintiffs' claims and all Class members' claims arise out of the

same uniform course of conduct by Defendants and arise under the same legal theories

applicable to all Class members.  In addition, Plaintiffs seek relief for the Plans under the same

remedial theories that are applicable to all Class members.

77.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately represent the

interests of all Class members.  Plaintiffs have no conflicts of interest with other Class members

and no interests that are different from any other Class other members.  Plaintiffs have retained

competent counsel experienced in class action and other complex litigation, including ERISA

class actions.

78.  **Potential Risks and Effects of Separate Actions.**  The prosecution of separate actions by individual Class members would create a risk of: (1) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (2) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

79.  **Predominance.**  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court and the parties will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial act and which does not bar Class certification.

80.  **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

81.  **Manageability.**  This case is well-suited for treatment as a class action and can

easily be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

82.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

83.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

84.     Therefore, this Action should be certified as a class action under Rules 23(a), and 23(b)(1), or 23(b)(3) of the Federal Rules of Civil Procedure.

## <u>COUNT I</u>
### (For Breaches of Fiduciary Duty)

85.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

86.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B), and (D), in that they failed and continue to fail to discharge their duties with respect to the Plans solely in the interest of the Plan's participants and beneficiaries and: (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) diversify the investments of the Plans so as to minimize the risk of large

losses; and (D) act in accordance with the documents and instruments governing the Plan. Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plans in the performance of their duties.

87.    To the extent any Defendant did not directly commit any breach of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach of fiduciary duty by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

88.    As a direct result of Defendants' breaches of fiduciary duties, the Plans have suffered losses and damages.

89.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plans the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, as well as attorneys' fees, costs, and other recoverable expenses of litigation.

## **COUNT II**
### **(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

90.    Plaintiffs incorporate by reference the allegations in the previous paragraphs.

91.    FCA, acting through the Board, is responsible for appointing, overseeing, and removing members of the Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

92.    In light of its appointment and supervisory authority, FCA and the Board had a

fiduciary duty to monitor the performance of the Committee and its members. FCA, the Board and the Committee as a whole also had a fiduciary duty to monitor the performance of the members of the Committee.

93.     A monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those related to the investment and holding of the Plans' assets, and must take prompt and effective action to protect the Plans and their participants when the monitored fiduciaries do not perform their fiduciary obligations.

94.     To the extent that any fiduciary monitoring responsibilities of FCA, the Board, or the Committee were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

95.     FCA, the Board, and the Committee breached their fiduciary monitoring duties by:

> (1)     Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plans suffered enormous losses due to the appointees' imprudent and disloyal actions and omissions related to the Plans;
>
> (2)     Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and
>
> (3)     Failing to remove appointees whose performances were inadequate in that they continued to maintain unsuitable investments in the Plan, all to the detriment of the Plans and its participants' retirement savings.

96.     As a consequence of these breaches of fiduciary duties to monitor, the Plans suffered substantial losses. If FCA, the Board and the Committee had discharged their fiduciary monitoring duties prudently, the losses suffered by the Plans would have been avoided or minimized. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plans and their participants lost millions of dollars in retirement savings.

97.     FCA, the Board, and the Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties, alleged in this Count, to restore to the Plans any profits made through use of the Plans' assets, and are subject to other equitable or remedial relief as appropriate.

98.     Each Defendant also knowingly participated in the breaches of fiduciary duties by the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches of fiduciary duties by failing to lawfully discharge their own fiduciary duties; and knew of the breaches of fiduciary duties by the other fiduciaries and failed to make any reasonable effort under the circumstances to remedy those breaches.  Defendants are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

### COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

99.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

100.     In the alternative, to the extent that any Defendant is not deemed to be a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

101.     To the extent any Defendant is not deemed to be a fiduciary or is not deemed to be acting as a fiduciary for any and all applicable purposes, any such Defendant is liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in these breaches of fiduciary duty by permitting the Plans to offer a menu of imprudent investment options, which was unjustifiable in light of the size and characteristics of the Plans.

### PRAYER FOR RELIEF

102.     WHEREFORE, Plaintiffs, on behalf of themselves, the Plans and the Class,

demand judgment against FCA for the following relief:

(1)    Declaratory and injunctive relief under Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(2)    Equitable, legal, or remedial relief to return all losses to the Plans and/or for restitution and/or damages as stated above, plus all other equitable or remedial relief as the Court may deem appropriate under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(3)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(4)    Attorneys' fees, costs, and other recoverable expenses of litigation; and

(5)    Such further and additional relief to which the Plans may be justly entitled and the Court deems appropriate and just under all of the circumstances.

### <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: October 20, 2025

Respectfully submitted,

*/s/ James C. Shah*
James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
         ajberin@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
         lrubinow@millershah.com

Alyson Oliver
OLIVER BELL GROUP
50 W. Big Beaver Road, Suite 200
Troy, Michigan 48084
Telephone: (248) 327-6556
Facsimile: (248) 436-3385
Email: aoliver@oliverlawgroup.com

Don Bivens
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450
Email: don@donbivens.com

*Attorneys for Plaintiffs, the Plans,*
*and the Proposed Class*